TACKETT & SCHAFFNER, INC.

v.

The UNITED STATES

No. 534–78.

United States Court of Claims.

July 16, 1980.

Mary L. Sfasciotti, Kenosha, Wis., attorney of record, for plaintiff.

Ransey G. Cole, Jr., Washington, D.C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D.C., for defendant.

Before DAVIS, KASHIWA and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge;

This suit by a disappointed bidder is before us on defendant's motion for summary judgment and plaintiff's opposition thereto. There is no genuine dispute as to material issues of fact. We grant defendant's motion and dismiss the petition.

The following facts are assumed to be true for the purposes of this motion. The case arises out of the negotiated procurement of a lease for office space by defendant, acting through the General Services Administration (GSA).[1] Although plaintiff was the low bidder, its bid was rejected for violating chapter 314, section 322, of the Economy Act of June 30, 1932, as amended, Pub.L.No. 72–212, 47 Stat. 412, 40 U.S.C. § 278a (1976). The Economy Act generally applies a limitation on the rental the Government can pay for leases costing over $2,000 per year, to 15 percent of the fair market value of the premises at the date of the lease. There is also a limitation on expenditures for improvements, alterations, and repairs of the rented premises of 25

---

1. 40 U.S.C. § 490(h)(1) (1976) authorizes the GSA Administrator to enter into lease agreements which "he deems to be in the interest of the United States and necessary for the accommodation of Federal agencies."

percent of the amount of the rent for the first year of the rental term.

The method for evaluating offers for compliance with the Economy Act is set forth in chapter 7 of the GSA handbook, entitled "Acquisition of Leasehold Interests in Real Property." First, the fair market value of the space to be rented is determined by appraisal and then the 15–percent limitation is applied. PBS P 1600.1 CHGE 10, ch. 7, ¶ 4a. Bidders' offers are then reduced by the estimated value of services to be furnished by them under the lease, such as heating, lighting, and janitorial services, and the like, to arrive at a net rental cost. PBS P 1600.1 CHGE 10, ch. 7, ¶ 2e. The net rental is the figure which must come under the 15–percent limitation. Plaintiff's bid was found to exceed the 15–percent limitation and it was rejected.

At the time of the instant procurement, GSA was leasing space from plaintiff in Harvey, Illinois. That lease expired April 30, 1977. Prior to its expiration, GSA began preparations for procuring another lease in the Harvey area which would accommodate the Government's need for an increased amount of space. Initially, the Government hoped to lease all of its space in one building but this proved impossible. In October 1975, GSA solicited offers for a portion of the space needed. Two offers were received, one from plaintiff. Both offers were rejected as nonresponsive because the offered rentals did not meet the limitation imposed by the Economy Act. Plaintiff was told that the space sought would be resolicited and that plaintiff would have a chance to submit another offer.

The solicitation process was repeated in May 1976. This time the area under consideration was expanded to include both Harvey and its vicinity. Again, plaintiff was among those submitting offers. The procurement was to be a negotiated one, not formally advertised, and negotiations with all prospective lessors were begun soon after receipt of the offers.

Plaintiff's offer was for 6,840 square feet of office space at an annual rental of $33,-789, or $4.94 per square foot. Parking space, apparently on a nearby lot, was included at no additional cost, as it had been under plaintiff's then current lease with the Government. However, it is important to note that parking space was *not* a requirement of the solicitation. Negotiations began with plaintiff in June 1976 and plaintiff was asked to reduce its offered rental. During preliminary discussions, it was estimated that under the Economy Act the maximum annual rental permissible for plaintiff's premises would be about $25,000. This was based on the *higher* of two appraisal figures the Government had on the premises. In a letter to plaintiff following that discussion, defendant's negotiator, Mr. Finn, indicated that all parking areas under plaintiff's control and furnished to the Government were required to be blacktopped and lighted to the capacity of 10–foot candlepower.

Plaintiff then amended its offer. In a confessed attempt to avoid the bar of the Economy Act, it increased its offer to 7,125 square feet of office space and reduced the rental to $24,937.44 per year, or $3.50 per square foot. However, the amended offer made mandatory an additional charge of $10,800 per year for parking throughout the life of the contract and the number of offered parking spaces was reduced from 45 to 30. Thus, the total cost of the office space and parking under the amended offer was $35,737.44 per year, or $5.01 per square foot. This was about $2,000 per year more than plaintiff's previous offer.

Mr. Finn reviewed plaintiff's amended offer. There was a question as to how to deal with the separate charge for parking. He consulted counsel and others within GSA about it. This apparently was a novel issue not specifically resolved by the GSA handbooks, by decisions of the courts, or by the Comptroller General. Mr. Finn finally decided that, based on the general guidelines in the GSA handbooks and his own experience, the parking charge had to be included in the gross rental and could not be deducted as a service charge for Economy Act purposes. On that basis, plaintiff's

bid exceeded the Economy Act maximum. Plaintiff was asked to further reduce the rental charge and to give the Government the option of acquiring the office space without the parking spaces. Plaintiff took the position that the parking charge was not to be included in the rental for Economy Act purposes. It did not amend its offer further except to extend the deadline for acceptance to October 1, 1976. GSA therefore considered plaintiff's offer unacceptable as a matter of law.

On September 21, 1976, GSA awarded the lease to the Canterbury Shopping Center in Markham, Illinois. The following day plaintiff was notified that its offer had been rejected. The award was protested by plaintiff through GSA bid protest procedures. The final agency decision denying the protest was issued on December 23, 1976. Plaintiff sued in February 1977 in the United States District Court for the Northern District of Illinois on its bid claim and to obtain attorney's fees for information sought pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (1976). The latter claim was dismissed and the bid claim was transferred to this court. The instant motion followed.

■ The law governing disappointed bidder cases is that the Government has an obligation to consider fairly and honestly bids submitted to it. *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 571, 492 F.2d 1200, 1202 (1974); *Keco Indus., Inc. v. United States*, 192 Ct.Cl. 773, 780, 428 F.2d 1233, 1237 (1970); *Heyer Products Co. v. United States*, 135 Ct.Cl. 63, 69–71, 140 F.Supp. 409, 412–14 (1956). If the Government breaches that obligation, the injured bidder may recover damages in the amount of its bid preparation costs. *Excavation Constr., Inc. v. United States*, 204 Ct.Cl. 299, 301, 494 F.2d 1289, 1290 (1974); *Keco Indus., Inc. v. United States, supra*, 192 Ct.Cl. at 784–85, 428 F.2d at 1240; *Heyer Products Co. v. United States, supra*, 135 Ct.Cl. at 71, 140 F.Supp. at 413–14. However, in order to recover, plaintiffs must show that the Government's actions were arbitrary and capricious and the standard of proof required is a high one. *Keco Indus., Inc. v. United States, supra*, 203 Ct.Cl. at 574, 492 F.2d at 1203; *Keco Indus., Inc. v. United States, supra*, 192 Ct.Cl. at 784, 428 F.2d at 1240. This standard is particularly difficult to meet where, as here, negotiated procurement is involved, since defendant's agents have much greater discretion in such cases than in formally advertised procurements. *Burroughs Corp. v. United States*, 223 Ct.Cl. ——, ——, 617 F.2d 590, 598 (1980). In addition, as heretofore noted, the Federal Property and Administrative Services Act of 1949 gives the broadest latitude to the GSA Administrator in determining the kind and scope of lease agreements for the accommodation of federal agencies. With this statement of the settled law in mind, we now turn to plaintiff's contentions.

■ It is plaintiff's position that GSA officials engaged in a series of bad faith manipulations of the procurement process in order to prevent plaintiff from getting the award. These actions involved (1) the appraisal of the value of plaintiff's property, (2) the negotiations over parking and the treatment of the parking charge, and (3) the deduction for the value of services.

As to the first point, in district court, plaintiff contended that defendant used an improperly deflated appraisal of the fair market value of plaintiff's property. That would lower the 15–percent ceiling and so require plaintiff to charge less rent. However, plaintiff does not repeat that argument here and so we regard it as abandoned. We do note that defendant did use the higher of the two appraisal figures it had in its appraisal reports.

Plaintiff contends a second example of bad faith is as follows: (1) defendant required plaintiff to make certain improvements to its parking spaces; (2) in order to defray the cost of such improvements, plaintiff was forced to increase the amount of its offered rental; (3) the improvements were so costly that plaintiff's rental then exceeded the Economy Act maximum. Hence, plaintiff argues, defendant's actions made it "impossible" for plaintiff to escape the bar of the Economy Act. Such reason-

ing is difficult to appreciate. First, parking was not even a requirement of the solicitation. Plaintiff could have omitted parking spaces entirely, not to mention costly improvements to its parking area. It was simply defendant's negotiating stance that *if* the parking area, proffered outside the solicitation's terms, was to be provided, it should be paved and lighted. There is no showing that the bid request was altered or that the negotiator had authority to amend it to include parking space in addition to office space. Second, even with the cost of improvements it was not "impossible" for plaintiff to come under the Economy Act maximum. Plaintiff need only to have reduced the charge for its office space. Defendant's request for improvements to the parking area amounted then to nothing more than an attempt to bargain down the rental plaintiff was charging for the office area. Defendant's agents, like any others, are to be expected to ask a bidder to reduce its rental charge when negotiating for a lease. That can hardly amount to arbitrary and capricious behavior. We reject this argument entirely.

▇ The next and key issue of the case is whether defendant properly treated the $10,800 per year charge for parking. Defendant included the charge in its calculation of plaintiff's net rental which had to meet the 15–percent Economy Act maximum. This was done for reasons discussed below. Plaintiff, however, asserts this was improper on three possible grounds. First, the Economy Act only refers to the "rent of any building or part of a building," and the solicitation requested offers on a square–foot basis, measuring square feet inside exterior walls. Therefore, plaintiff reasons, since the parking spaces were exterior to, and not a part of, the building, the parking charge should be excluded from the rental calculations entirely. Plaintiff's second argument is that if the parking charge is included in the gross rental figure, it should be deducted as a service charge in calculating the net rental which must meet the 15–percent limitation. Alternatively, plaintiff argues that since the parking charge represented the amortized cost of the im-

provements defendant requested, only the 25–percent limitation should apply rather than the 15. We find these arguments without merit for the reasons which follow.

The form of plaintiff's offer, with its mandatory $10,800 per year charge for parking, apparently presented a novel situation to GSA officials. No express provision of statute, regulation, or the GSA handbooks covered it, and no one knew of any case law on the issue. Plaintiff does not claim that there was any administrative practice covering this situation either. The situation was an ambiguous one. While the parking lot was exterior to and not a part of a building, there would seem to be no reason to distinguish, for Economy Act purposes, an offer which included a parking lot that happened to be in a building from one with an exterior parking lot. Arguments can also be made on both sides of the question as to whether the parking charge constituted a deductible service or operating cost, like charges for heating, lighting, and janitorial services. There is also an ambiguity as to whether the cost of the contemplated improvements to the parking area should be considered as a part of the rental consideration, and so subject to the 15–percent limitation, or as separate from the rental and so subject to the 25–percent limitation.

Defendant's agents also had to consider three other factors. First, parking was not even a requirement of the solicitation, yet plaintiff made the parking charge a mandatory part of its offer. Second, plaintiff's practice under its then current lease with the Government was to provide parking spaces free of charge. Third, plaintiff's initial offer in this latest solicitation also included free parking but when advised of the Economy Act limitation, plaintiff subtracted $9,000 from its charge for "office space" and added a $10,800 charge for "parking spaces." Given those circumstances, the GSA officials felt that the parking charge had to be considered a part of the net rental for testing Economy Act compliance. We think their resolution of the ambiguity was entirely reasonable and that

plaintiff's was not. Indeed, if plaintiff's transparent maneuver were held sufficient to avoid the 15–percent maximum in the Economy Act, then that limitation would be without meaning or effect. Hence, the treatment of the parking charge was proper and in no way an arbitrary and capricious action. We will not sanction plaintiff's admitted attempt to circumvent the law.

Plaintiff's next argument is that defendant used an improper value for plaintiff's service costs. Plaintiff says that an appraiser whom defendant used testified in the district court that the value of plaintiff's services would be $1.92 per square foot. The figure defendant actually used was only $1.42 per square foot. It should be recalled that the value of services is deducted from the gross rental for determining compliance with the Economy Act. The use of the lower value for service charges therefore results in a higher net rental and so makes it more difficult to come under the 15–percent limitation. Plaintiff does not make any specific attack on the $1.42 figure that defendant used. Indeed, the parties give us no explanation at all of the basis for the difference between the two figures. However, even if defendant had used the $1.92 figure, plaintiff's bid would still exceed the Economy Act maximum and thus would be unacceptable. Whether the use of the $1.42 figure was error is, therefore, immaterial and demonstrates none of the bad faith or arbitrary and capricious action alleged by plaintiff.

We hold that plaintiff's bid was properly rejected as nonresponsive since it was barred by the Economy Act. We note that there is no evidence here of the bad faith manipulations of the procurement process that plaintiff alleges. Plaintiff was given notice of each of the solicitations and had the opportunity to submit bids each time. Plaintiff was told of the Economy Act limitation, was given an opportunity to amend its bid to come within that limitation, and was informed of defendant's position regarding the parking charge. Therefore this case is unlike *Continental Business Enterprises, Inc. v. United States*, 196 Ct.Cl. 627,

452 F.2d 1016 (1971), where defendant's contracting officer violated a statutory duty to negotiate by refusing a bidder the opportunity to amend its unacceptable bid to make it acceptable. Plaintiff here had the opportunity to amend its bid to make it acceptable, but chose not to do so. Plaintiff has no grounds for complaint about the treatment of its bid.

█ Plaintiff's last argument is that Canterbury's bid, the one which was accepted, was also nonresponsive. However, plaintiff's bid was nonresponsive because it failed to comply with the Economy Act and it was rejected on that basis. Therefore, plaintiff is not entitled to recover here even if the award to Canterbury was improper. *Heyer Products Co. v. United States*, 147 Ct.Cl. 256, 263, 177 F.Supp. 251, 255 (1959). In any event, the facts in Canterbury are so different that they have no bearing in the present case.

To conclude and as shown above, the statute, 40 U.S.C. § 490(h)(1) (1976), gives the GSA Administrator wide discretion within the bounds of the Economy Act to decide which lease agreements will best serve federal agencies. We could set his decision aside only for abuse of that discretion. Plaintiff has not made a prima facie case of abuse which would defeat the motion. This was plaintiff's burden. We are satisfied that defendant has followed the law and has not abused its discretion in refusing to award the subject lease to plaintiff. There was a legal and rational basis for its decision. Plaintiff's other arguments merit no discussion. Defendant's motion for summary judgment is granted. The petition is dismissed.